UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK_____X

WILLIAM J. GLASER,

       Plaintiff

      -against-

GAP, INC. and MILINDA MEJORADO,         11 CIV 6679 (CS)(GAY)

       Defendants.
_____X

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

<div style="text-align:right">

Helen G. Ullrich (HU6597)
BERGSTEIN & ULLRICH, LLP
Attorneys for Plaintiff
15 Railroad Avenue
Chester, New York 10918
845 469 1277

</div>

ON THE BRIEF
Helen G. Ullrich, Esq.
Stephen Bergstein, Esq.
Marie Condoluci, Esq.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................. 1

STATEMENT OF FACTS ................................................................................... 1

    1.     Plaintiff's disability ............................................................................. 1

    2.     Plaintiff applies to work for the Gap .................................................. 2

    3.  The Gap hires plaintiff .......................................................................... 3

    4.  Plaintiff's workplace relationships with co-workers ............................. 4

    5.  Plaintiff's workplace relationship with Mejorado ................................. 7

    6.  Plaintiff's termination ........................................................................... 15

ARGUMENT ........................................................................................................ 17

    SUMMARY JUDGMENT IS UNWARRANTED ......................................... 17

POINT I

    PLAINTIFF HAS PROPERLY EXHAUSTED HIS
    ADMINISTRATIVE REMEDIES .................................................................. 18

POINT II

    PLAINTIFF HAS ESTABLISHED A *PRIMA FACIE*
    CASE OF DISCRIMINATION ....................................................................... 19

        A.    Plaintiff is Disabled Within the Meaning of the ADA ............ 19

        B.    Plaintiff was Otherwise Qualified to the Perform
              the Essential Functions of his Job With A Reasonable
              Accommodation ...................................................................... 23

POINT III

    PLAINTIFF WAS TERMINATED BECAUSE
    OF HIS DISABILITY ..................................................................................... 26

POINT IV

    DEFENDANT MEJORADO IS AN AIDER
    AND ABETTER UNDER STATE LAW......................................................29

CONCLUSION....................................................................................................30

## TABLE OF AUTHORITIES

**STATUTES**

Americans With Disabilities Act, *as amended*, 42 U.S.C. §12101 *et seq.*.................19

42 U.S.C. § 12111(8)..................................................................................................23

42 U.S.C. § 12111(9)(B).............................................................................................23

New York Executive Law § 296..................................................................................29

29 C.F.R. § 1630.2(i)(2) (citing ADAAA § 2(b)(4))...................................................22

29 C.F.R. Pt. 1630 App, § 1630.2(i) ...........................................................................22

29 C.F.R. § 1630.2(j)(1)(ii).........................................................................................22

29 C.F.R. Pt. 1630 App, § 1630.2(j)(1)(ii)..................................................................22

29 C.F.R. § 1630.2(j)(3)(iii)........................................................................................21

29 C.F.R. § 1630.2(j)(4)(iv)........................................................................................21

29 C.F.R. Pt. 1630, App. § 1630.2(j)(3)......................................................................21

**CASES**

*Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008)............................25

*Bragdon v. Abbott*, 524 U.S. 624 (1998)....................................................................22

*Borkowski v. Valley Central Sch. Dist.*, 63 F.3d 131, 143 (2d Cir. 1995)..........25, 27, 28

*Deravin v. Kerik*, 335 F.3d 195, 200-01 (2d Cir. 2003).............................................18

*Goonan v. Federal Reserve Bank of N.Y.*, 12 Civ. 3859, 2013 U.S. Dist. LEXIS 3764, at *24 (S.D.N.Y. Jan. 7, 2013)............................................................28

*Higgins v. Md. Dep't of Agric.*, No. L-11-0081, 2012 U.S. Dist. LEXIS 25303, at *18 (D. Md. Feb. 28, 2012))..................................................................24

*Jacques v. DiMarzio, Inc.*, 386 F.3d 192 (2d Cir. 2004)....................................21, 22, 23

*Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545-46 (2d Cir. 2010)........................17

*Mathirampuzha v. Potter*, 548 F.3d 70, 75 (2d Cir. 2008)........................................18

*McElwee v. County of Orange*, 700 F.3d 635, 643 (2d Cir. 2012)............................21, 24, 26

*McMillan v. City of New York* , 711 F.3d 120, 125 (2d Cir. 2013)............................19, 24

*Olmstead v. Zimring*, 527 U.S. 581, 597-98 (1999)..................................................22

*Shavuo v. Shinseki*, 10 Civ. 2914, 2013 U.S. Dist. LEXIS 48428
(S.D.N.Y. April 3, 2013)..................................................................................27

*Staub v. Proctor Hospital*, 131 S.Ct. 1186 (2011)......................................................26

*Stephan v. Irondequoit Cent. Sch. Dist.*, 769 F.Supp.2d 104, (W.D.N.Y. 2011),
*aff'd*, 450 F. App'x 77 (2d Cir. 2011)..................................................................19,23

*Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995)........................................29

*Toyota Motor Manufacturing v. Williams*, 534 U.S. 184 (2002)................................20, 22

## PRELIMINARY STATEMENT

Plaintiff William Glaser submits this memorandum of law in opposition to defendants' motion for summary judgment on his disability discrimination claim brought under the Americans with Disabilities Act and the New York Executive Law.

## STATEMENT OF FACTS

### 1. Plaintiff's disability

Plaintiff William Glaser is a 37-year old man who suffers from a variety of neurological or developmental disabilities. He is on the Autism Spectrum. (Abelove Decl. ¶9).

Plaintiff was first diagnosed with developmental problems in early childhood. He lacked fine motor skills, and he developed language skills several years behind other children, being unable to form complete sentences until age six. (D. Glaser Aff. ¶3). Plaintiff's intellectual abilities range from borderline to moderately-impaired. His academic functioning is within the grammar school range, *i.e.*, his verbal function falls within the fourth grade range while his math ability is much poorer, falling within the first grade range. Although he can read the numbers on a watch or clock, plaintiff cannot tell time. As a result of his neurological impairment, he cannot interpret what the numbers mean. Plaintiff also has limited cognitive abilities that may lead to misunderstandings and inappropriate responses in interacting with other people. (Abelove Decl. ¶8 ).

Because of his disabilities, plaintiff is at times unaware that others may perceive his affect or conduct as inappropriate. When plaintiff is under stress, his ability to process language and choose appropriate words becomes even more limited. (Abelove Decl. ¶ 10). Throughout his school years, plaintiff was placed only in special education classes and aged out of high school at age 21 with an IEP (special education) diploma. (D. Glaser Aff. ¶4).

After high school, plaintiff began to receive services from a New York State agency,

Vocational and Educational Services for Individual with Disabilities (VESID) (Plaintiff Aff. ¶3 ) and its subcontractor, Integrated Employment Services, Abilities First, Inc. (Hughes Aff. ¶1). This agency's client population includes persons with mental or emotional disabilities and brain damage and other physical disabilities. (Id. ¶3). This subcontractor provides employment services, including job development, job coaches and retention specialists to persons with disabilities. These services are free to both the client and the employer and help employers to integrate persons with disabilities into the workplace. (Id. ¶¶ 2, 22). Its job coaches and retention specialists are also trained to identify, analyze and solve problems. (Id. ¶4).

Through the efforts of a VESID job developer, plaintiff found part-time employment at the Culinary Institute of America in Hyde Park, where he also received services from a VESID job coach and retention specialist. (Plaintiff Dep. 35-41). He held this job for five years, eventually leaving to find full-time work. (Id. 42:25-43:11). Moreover, in his present employment at the Millbrook School, plaintiff has access to ongoing services from a VESID retention specialist. (Plaintiff Aff. ¶4 ).

2. **Plaintiff applies to work for the Gap**

In spring 2002, Sheree Hughes was assigned as a job developer to help plaintiff seek appropriate employment. (Hughes Aff. ¶7). Hughes works for Abilities First, Inc. (Id. ¶ 1). She initiated the application process and spoke by telephone with Human Resources at the Gap's distribution center in Fishkill, New York. (Id. ¶8). After plaintiff submitted his job application, the Gap scheduled a job interview. (Id. ¶10). Hughes accompanied plaintiff to the Human Resources department. (Id. ¶11). After she identified herself, Hughes told the Gap recruiter that her agency could offer the services of a job coach for plaintiff to assist him in his employment. (Id. ¶¶12, 23-

24). The Gap recruiter said the company would not accept her offer of a job coach because, if plaintiff were hired, his supervisor would work with him. (Id. ¶¶ 13, 25). He also said that the Gap did not want any outside people coming in to help employees, and that if plaintiff needed assistance, then he probably would not get the job. (Id.).

When Hughes toured the facility and raised concerns about plaintiff's ability to handle numbers, the Gap recruiter said that whoever was training plaintiff would assist him. (Id. ¶¶ 14-16). At any time during his employment, the Gap could have contacted Abilities First, Inc. or VESID to obtain the services of a job coach or retention specialist. (Id. ¶ 18). Hughes attests that "[o]ur agency would have reopened plaintiff's file, worked with plaintiff and Gap management personnel to identify the problem and would have assigned appropriate staff to assist both plaintiff and the Gap to enable plaintiff to succeed." (Id. ¶ 18). Moreover, "[a] job coach or retention specialist would have been able to work with Gap management to help plaintiff understand workplace expectations and actions he needed to take to meet them." (Id. ¶ 19). Hughes's agency would also provide the services of a psychologist to evaluate plaintiff and help Gap management understand the nature of his disability and any necessary accommodations. (Id. ¶ 20). These services are provided free to employers and persons with disabilities to enable such employees to succeed in the workplace. (Id. ¶¶ 19, 22).

### 3. The Gap hires plaintiff

During his job interview, plaintiff mentioned his disability and asked if he could have a job coach or retention specialist. The interviewer told him that was not a good idea, and that the Gap had its own supervisors and trainers who could help him. (Plaintiff Dep. 67:3-16). The Gap hired plaintiff as a Merchandise Handler in May 2002. (Plaintiff Aff. ¶ 5). Because the Gap recruiter told

him that he could not have a job coach or retention specialist, plaintiff signed a VESID form declining these services. (Id.¶6).

Plaintiff worked for the Gap for 7.5 years. (Plaintiff Aff. ¶7 ). His supervisors changed from time to time. They included Mike Moletsky, Chris D'Andrade, Rudy Ramirez, Alfie De'Sa, Corrine Flemming De'Sa, Ellen Roush, Rudy Ramirez, Milinda Mejorado and Katie Connolly. (Id. ¶8). Plaintiff also interacted with managers Chris Vitulis, Craig Brown and facility director Greg Uren. (Id. ¶9 ). He also interacted with Human Resources staff, including Allison duBois, Sarah Hartwell and Joelle Virgilio. (Id. ¶10 ). Throughout his employment, plaintiff told his supervisors, managers and Human Resources staff about his disability, as best he could. (Id. ¶11). Plaintiff usually described his disability in terms of his inability to tell time, count or do math; those were the symptoms that were most relevant to him and of which he was aware. (Id. ¶12).

Plaintiff functions and lives in the concrete cognitive world. Because of his language/cognitive disability, he often does not register the abstract aspect of the world around him. (Abelove Decl. ¶11). Anyone who spends even a few minutes with plaintiff would know that he is neurologically impaired. (Abelove Dep.20:8-23:5; 50:17-21; Hughes Aff. ¶31). Moreover, throughout his employment, co-workers, supervisors and Human Resources personnel described conduct by plaintiff that could only have been the result of obvious neurological impairment. (Abelove Dep. 20:8-23:5; 50:17-21).

**4. Plaintiff's workplace relationships with co-workers**

Richard Buckner, plaintiff's first trainer, testified that it was obvious that plaintiff was disabled (Buckner Dep.133:4-135:19) and that his supervisors were aware of it. (Id. 136:14-137:24). For example, Buckner spoke with supervisor Mike Moletsky about plaintiff's confusion when

confronted with new procedures or tasks, his difficulty relating to people, following them around or fixating on a problem that occurred in the workplace. (Buckner Dep. 222:24-225:5). Buckner testified that he called plaintiff "Rain man" after the autistic character in the movie of the same name. (Id. 225:6-226:18). Buckner also testified that, when plaintiff became upset, he would turn red, shake or tremble and clench his fists in front of his chest. (Id. 226:19- 227:11). Buckner never interpreted plaintiff's behavior in those situations as violent or threatening. (Id. 227:12-23). Buckner also testified that, when he told plaintiff's supervisors about plaintiff's confusion when his routine was disturbed, they told him to try to calm him down. Buckner would talk to plaintiff and take him to get a soda or coffee. These situations arose when plaintiff thought he was not able to perform a task or when he thought he had done it wrong. (Id. 228:14-231:23). Buckner also told plaintiff's supervisors that plaintiff would follow others around. Buckner believed that the supervisors spoke with plaintiff about this. (Id. 236:7-23). Buckner also told plaintiff's supervisors that plaintiff would fixate and was unable to solve problems. (Id. 237:238:9-24).

Human Resources Generalist Joelle Virgilio worked with plaintiff from early 2008 until he was fired. (Virgilio Dep. 22:14-21). Virgilio outlined a litany of behaviors that caused her and others concern: plaintiff routinely arrived at work two hours before the start of his shift and spent time at the desk of the loss prevention (security) staff person, who complained, in November 2008, that he made her uncomfortable. (Id. 25:25-26:14). Plaintiff would also "greet" fellow employees as they filed through the turnstile in the morning, having animated conversations about his recent activities. (Id. 31:15-32:11). In March 2009, a female security person formally complained that

plaintiff came in early and would not leave her alone. (Id. 35:23-36:12).[1] Plaintiff followed other employees around, including co-workers and supervisors. (Id.55:2-17; Roush Dep. 57:9-25). Plaintiff asked his supervisor, Mejorado, to give him a "surprise" birthday party and was upset and angry when she refused. (Virgilio Dep.79:2-16).

Virgilio found plaintiff's conduct "strange." (Virgilio Dep. 79:17-19). She recognized that plaintiff was socially-awkward, and that he did not know how to generate a conversation. He stood too close and talked too loudly, and did not realize that he talked about things of no interest to his listener. (Id. 94:6-11). On September 9, 2009, plaintiff told supervisor Kate Connolly that someone had stolen his equipment while he was in the restroom. He wanted the warehouse locked down until it was found. In fact, plaintiff's equipment was where he had left it; he had been looking for it in the wrong location. (Id. 107:2-24).

When he was upset, plaintiff turned red and clenched his fists. (Virgilio Dep. 111:18-112:8). Virgilio recognized in plaintiff behaviors similar to those of her son, who is autistic. (Id. 62:4-63:14; 51:4-22). Virgilio wanted to begin "an ADA process" for plaintiff (Id.), and she discussed it with her manager, Barbara Munoz. (Id. 51:23-24). Virgilio testified that the ADA process never took place because plaintiff rejected any need for assistance. (Id. 52:21-53:6). However, plaintiff denies that this conversation ever occurred. Plaintiff has known for many years that he has a disability. He has told numerous supervisors about several aspects of his disability and has always been willing to accept help. (Plaintiff Aff. ¶13). Virgilio also considered a psychological evaluation a viable option. While she suggested that evaluation to Human Resources Manager Mark

---

[1] Defendants were unable to produce any documents about this complaint or any investigation or remedial action taken as a result.

O'Hanlon, it was not pursued. (Virgilio Dep. 60:9-24; Ex.4)

Ellen Roush, another supervisor, testified that plaintiff invaded the personal space of others. He would not stop talking and would follow her around. (Roush Dep. 56:5-57:25). Roush did not report Glaser's conduct formally. She spoke about it to her manager, Chris Vitulis. (Id. 60:18-25). Vitulis did not think any action was necessary because Roush did not make a formal complaint. She did not speak with anyone in Human Resources about it. (Id. 61:2-13).

Former supervisor Rudy Ramirez also reported plaintiff's early morning conduct and testified that plaintiff would try to follow him into the warehouse, before he was permitted to do so. (Ramirez Dep. 29:5-19; 58:24-59:20). Ramirez also testified that plaintiff sometimes wandered away from his assigned station. (Id. 31:4-32:25). Plaintiff also experienced difficulty knowing when to take his break. (Id. 34:2-25).

The Gap employs a security force at the Fishkill facility, called Loss Prevention. (Mejorado Dep. 60:4-25). Two security staff are usually located at the front desk, near the location where employees enter the building. (Id.). Supervisors were trained to call Loss Prevention in the event of workplace violence (Id. 61:13-18), either by dialing zero or the direct extension. (Id. 61:19-23). If the situation warranted it, Loss Prevention was responsible for escorting employees off the premises. (Id. 62:3-7). At no time during his employment was plaintiff escorted off the premises. (Plaintiff Aff. ¶27 ).

**5. Plaintiff's workplace relationship with Mejorado**

Defendant Milinda Mejorado commenced work at the Fishkill distribution center in 2003. (Mejorado Dep. 19:19-24). In early November 2008, she transferred as an operations supervisor to the first shift, where she worked with supervisor Rudy Ramirez until he left the Gap's employ in

summer 2009. (Id. 42:6-25). Ramirez was replaced by supervisor Katie Connolly. (Id. 43:2-20). Mejorado was plaintiff's supervisor from November 2008 until he was fired in November 2009. (Plaintiff Aff. ¶28 ).

When Mejorado began working in the department, the Gap had a new productivity policy. Plaintiff already had received a few coachings on his productivity from his former supervisor, Corinne De'Sa. Mejorado had to give plaintiff his first counseling and corrective action. (Mejorado Dep.111:10-18; Def.Ex. 49 ). Because of his disability, it would have been impossible for plaintiff to understand the language in this corrective action. (Abelove Decl. ¶ 12). However, plaintiff knew that he was being placed on corrective action, a first step in the disciplinary process. Plaintiff became very upset. (Plaintiff Aff. ¶14 ). Mejorado was not surprised that plaintiff became upset at the corrective action, and she testified that, when plaintiff is upset, he tends to clench his fists, stiffen up, and his face turns red. (Mejorado Dep. 156:11-24). She did not believe that plaintiff was threatening in any way. (Id. 159:3-5)

As she had only worked with the associates for a short while, Mejorado collaborated with Ramirez in preparing the year-end HARP performance review. (Mejorado Dep.120:4-9). Defendants' Exhibit 50 is plaintiff's undated HARP year-end performance review. (Id. 117:17-24). Mejorado was able to rely upon the mid-year review completed by De'Sa in completing that document. (Id. 119:21-23). In this HARP review, plaintiff received an overall rating of AT (above target).

From November 2008 until April 2009, Mejorado had no threatening or uncomfortable interactions with plaintiff. However, in April or May, she gave plaintiff a productivity report that upset him. He crumpled the paper and threw it on the floor; this made Mejorado feel uncomfortable.

(Mejorado Dep.159:14-23; 161:2-4).

Plaintiff testified that he was anxious about the change to Daylight Savings Time in Spring 2009 and worried that he would come to work at the wrong time. When plaintiff explained his problem to Mejorado, she replied, "do me a favor and get your fucking watch fixed." (Plaintiff Dep. 892:3-893:3). Plaintiff told Virgilio about this exchange. (Id. 896:14-897:16).

Mejorado completed the next HARP review for plaintiff without input from Ramirez, who had left the Gap's employ in August. (Mejorado Dep. 120:13-18; Ramirez Dep. 66:19-24). In this review, she downgraded plaintiff's ratings to BT (Below Target) in behavioral areas directly related to his disability. (Def. Ex. 63; *see also* Abelove Dep. 25:7-26:15). These included the following:

    Is the Associate willing to support the needs of the business?

    Does the Associate complete all aspects of the job with little or no supervision?

    Is the Associate dependable toward job responsibilities?

    Does the Associate consider his/her impact on others?

    Does the Associate follow directions?

    Does the Associate respond to change?

    Does the Associate promote a welcoming and inclusive environment?

In the above categories, for the first time in his career at the Gap, Mejorado rated plaintiff BT (below target). In addition, her comments indicated that plaintiff was having increasing difficulty coping. Mejorado admitted that, during late 2008 or early 2009, she wondered whether plaintiff had a developmental disability. (Mejorado Dep. 130:7-14). When plaintiff told Mejorado that he had a disability in telling time, doing numbers, and math, she became very uncomfortable,

as shown by the look on her face. (Plaintiff's Dep. 213-214, 216). She did not respond when plaintiff told her this and simply walked away. (Id. 216).

Plaintiff was so upset by this HARP review that he destroyed it rather than show it to his parents. (Plaintiff Aff. ¶15 ). In fact, from summer 2009 until he was fired that November, plaintiff experienced repeated and continuous stress as he tried to avoid another bad HARP review and struggled to please his new supervisor. (Abelove Dec. ¶13 ). While plaintiff was unaware of the effects of stress upon his behavior, the record of events from summer 2009 until his termination shows how his disability affected his ability to navigate the workplace, understand what was happening and interact appropriately with others, especially Mejorado. (Abelove Decl. ¶14; *see also* D. Glaser Aff. ¶5 ).

In early August, plaintiff asked Mejorado for a "surprise" birthday party, believing that she had done so for others. (Plaintiff Aff. ¶16 ). When Mejorado refused, plaintiff became visibly upset, clenching his fists and turning red. Mejorado reported the incident to Virgilio, who asked her to report it to Human Resources manager Mark O'Hanlon. (Mejorado Dep.167:9-23; see also Ex. P3 ).

Two days later, plaintiff called Mejorado to say that he was having a problem with his wearable. However, when he came to her office, he did not bring the wearable with him. Mejorado reported this incident to Virgilio. (Def. Ex. 62). That day, Virgilio and O'Hanlon met with plaintiff to discuss his conversations with his supervisor and the fact that she was becoming uncomfortable. (Id.). They spoke to plaintiff about inappropriate conduct and personal space. (Id.). While plaintiff stated that he understood their concerns, Virgilio's account of that meeting makes it clear that he did not. (Abelove Decl. ¶15 ). Plaintiff responded that he would not talk to his supervisors any longer,